## THE STATE OF IOWA;

IOWA CITY, JUNE TERM, A. D. 1849,

In the third year of the State.

---

PRESENT:

HON. JOSEPH WILLIAMS,  CHIEF JUSTICE.
"  JOHN F. KINNEY, } JUDGES.
"  GEORGE GREENE, }

---

## HARRIMAN *v.* THE STATE.

The act of 1839, authorizing district judges to hold special terms of court whenever they deem it necessary, was not repealed by subsequent acts passed to fix and change the time for holding court. The eighth section of said act is not repugnant to the organic law, nor to the state constitution of Iowa.

Statutes *in pari materia* should be taken together as one law, and should, if practicable, be so construed that every provision shall continue in force.

In a question of construction, all doubt should favor the validity of a law under which rights have been acquired.

Notice of a special term as directed by the act of 1839, is not an essential prerequisite to confer jurisdiction. The statute providing for the notice is directory. It will be presumed that the notice was given, even if the record does not state the fact.

Harriman *v.* The State.

"State of Iowa" and "The State of Iowa" are substantially synonymous terms.

Where an indictment appears to have been exhibited in open court, by the grand jury, and is indorsed "a true bill" over the signature of the foreman, it is conclusive evidence that it was duly found by a legal grand jury.

American courts, have dispensed with many of the stringent rules and nice technicalities, which formerly obtained in the English courts in criminal cases.

The record proper in a criminal case, after stating the time and place of holding court need only set forth the indictment, properly indorsed as found by the grand jury; the arraignment of the accused; his plea; the impanneling of the traverse jury; their verdict; and the judgment of the court.

Any decision of a court made preliminary to a final judgment, is, *per se,* a part of the record; but all other proceedings such as motions, exceptions, testimony and the like are no part of the record unless made so by order of the court, by agreement of the parties, by demurrer to evidence, by special verdict or by bill of exceptions.

Only such matters as are of record can be brought to the notice and review of this court.

Irregularity in proceedings is waived by pleading and submitting to a verdict without objection.

Where on account of prejudice, interest, or other objection, the sheriff is rendered incompetent the coroner should perform his duty; but if the party objecting to the sheriff asks the court to appoint an elisor, he by implication manifests an objection to the coroner also, which will justify the court in appointing an elisor.

Where a jury was summoned by the sheriff after the prisoner made affidavit that the sheriff was prejudiced against him, but the jury was not objected to until after the verdict, it was held that the objection came too late, and that the irregularity was waived.

If a case is not submitted to the jury impanneled at a regular term to try the case, a second jury may be impanneled for the trial at a subsequent term.

A prisoner should be present at his trial, and when the verdict is pronounced.

Where the record shows that the prisoner was regularly arraigned; that he was brought into court; and took bills of exceptions, it sufficiently shows his presence during the trial.

The names of the witnesses on whose evidence an indictment is found, should be indorsed on every true bill returned by the grand jury; but they need not be made a part of the record.

Many legal forms and technicalities possess marked utility in practice.

Where the oath required by statute, is in substance administered to a jury it is sufficient.

Where the jury are "sworn the truth to speak upon the issue joined between the parties" it is not sufficient in a trial for murder.

### Error to Washington District Court.

*Opinion by* GREENE, J.   In this case, John C. Harriman was indicted for murdering one David N. Miller. It appears that the prisoner on being arraigned, pleaded not guilty; and thereupon the court proceeded to impannel a jury.   The defendant then made application for a continuance, which was granted.   Subsequently, October 30, 1848, a special term of the district court was held.   Upon an affidavit previously filed by the defendant, that the sheriff was prejudiced against him, one Robert Rinkade was appointed elisor to return a jury.   Only eight of the jurors were impanneled on the first day of the term, and they were placed in charge of the elisor with directions, that they should not be separated, and to have them in court on the following morning.   On the second day the panel of jurors was completed, and sworn "the truth to speak on the issue joined between the parties."   The examination then commenced but not being completed, the jury was placed under the charge of the elisor for the night, to be returned into court the next morning.   The cause was submitted to the jury on the evening of the third day, when they retired in charge of the elisor to consider their verdict, and on the fourth day returned a verdict of guilty as charged in the indictment.   Motions in arrest of judgment and for a new trial were made and overruled; and a judgment in due form and sentence of execution were rendered against the prisoner.

To the proceedings in this case there are twelve errors assigned; the most material of which we will proceed to examine.

1. It is contended that the special term of court was not authorized by law, and as a consequence, all the proceedings in the case are *coram non judice*.   This position is clearly correct if the judges of the district court were not authorized by statute to appoint special terms of their courts.   In January 1839, an act was passed, fixing the

Harriman *v.* The State.

terms of the district courts; dividing the territory into three judicial districts, assigning them to the respective judges; authorizing them to exchange districts as often as they might agree to do so, and to hold courts in each other's district in cases of absence or sickness; and also authorizing each judge to hold a special term of the district court whenever he should deem it necessary, for the trial either of civil or criminal causes. Statute of 1839, p. 128. In the year following, acts were passed changing the time of holding courts in all the districts, but interfering in no other particular with the act of 1839. In 1843, another change was made in the time of holding courts in the second district; and by statute of 1846 p. 12, new counties were attached to each district, and the time was again changed. By the fifth section of this statute all contravening enactments were repealed. There was no feature in this act contrary to that of 1839, which empowered the judges to exchange districts, and to hold special terms of court; consequently these sections continued still in force.

Again, by the laws of 1847, p. 74 a general change was made in the time and an additional district formed; and finally by statute of 1848 p. 51, an act fixing the times and places of holding the district courts in the first judicial district was passed, providing that in Washington county it should be held on the second Monday in March, and on the first Monday in September. It is strenuously urged that as this act expressly fixed the time and place of holding court and provides for no special terms, that the district judge had no legal power to hold such a term; that these various changes in times of holding the courts, and in the size and number of the districts have effected a complete repeal of the statute first cited; but in what manner or by what provision of law this complete repeal is effected we are unable to comprehend. In all these changes, and in our transposition from territorial to state government, we see nothing that seriously affects the fifth, sixth, and eighth sections of the act of 1839. Their abrogation, however adroitly argued, cannot be legitimately as-

34

sumed from any of the reasons and references which have been submitted to our consideration. They still stand before us in bold relief as the sovereign will of the legislature, perfectly compatible with subsequent enactments, *in pari materia*, and we cannot therefore regard them as repealed by the speculative rules of construction which counsel have so ingeniously applied. It must be conceded that acts, *in pari materia*, should be taken together as one law, and so construed if practicable, that every provision shall continue in force. *Pearce* v. *Atwood*, 13 Mass. 324, 344; *Holbrook* v. *Holbrook*, 1 Pick. 248, 254; *Haynes* v. *Jenks*, 2 Pick. 172, 176; *U. States* v. *Freeman*, 3 Howard 556; *Hays* v. *Hanson* 12, N. H. 284; *Morris* v. *The D. & S. Canal*, 4, Watts & Serg. 461; *Harrison* v. *Walker*, 1 Kelly 32.

Again it is quoted in the books as a general and uncontroverted principle that " although two acts are seemingly repugnant; yet they· shall if possible, have such construction that the latter shall not repeal the former by implication." Bac. Abr. Statute D; *Foster's* case 11 Coke 63; *Weston's* case Dyer 347. And we have it from quite recent authority that the law does not favor repeals by implication. *Locker* v. *Brookline* 13 Mass. 342, 348; *Wyman* v. *Campbell* 6 Port. 219; *Goddard* v. *Boston* 20 Pick. 407, 410; *McCartler* v. *Orphan Asylum Society*, 9 Cowen, 437, 506; *Bowen* v. *Lease* 5 Hill. 221, 225.

Properly observing the rules which prevailed in the f regoing cases, and applying them with all their force of analogy to the question under consideration, we cannot suppose a well founded doubt can be entertained, that those three sections of the statute of 1839, are still in force and that our district judges possess the legal power of appointing and holding special terms of their courts.

The law of 1848 p. 21 conferring additional powers on the judge of the second judicial district to adjourn regular terms as fixed by law, in order to hold special terms at the same time, is referred to as an argument favoring the repeal of the statute of 1839. But we are unable to see

Harriman *v.* The State.

much force or application in this reasoning. The new statute has no relation or reference to the former enactment. The old law is general in its application, conferring powers and duties generally upon the judges of the district courts; it is confined to no particular judge or number of judges, but has a jurisdiction co-extensive with the state. The new law is confined to one particular district; and confers upon its judge, powers unauthorized by the general statute. How can the latter then be regarded as a repeal, even by intendment of the former statute? or be construed into a rational supposition that the legislature regarded it as repealed, even if their regarding a law as repealed would make it so. The courts, the proper tribunals to judge of the force and effect of statutes, have by cotemporaneous construction, and judicial action recognized the existence and vitality of that statute; and hence if this could be regarded as a question of doubtful construction, that doubt, from motives of public convenience and policy should favor the validity of the law, in order to preserve undisturbed the rights of parties and titles to property which have been adjusted under its usage.— *Rogers* v. *Goodwin* 2 Mass. 475, Opn. of the justices 3 Pick. 517; *Beals* v. *Hale*, 4 How. U. S. 37; *The People* v. *Canal Commissioners* 3 Scam. 153, 160; And again in this case the rule, that a long and uninterrupted practice under a statute is good evidence of its construction, must have its force. *McKeer* v. *Delaney* 5 Cranch 22; *Morrison* v. *Barksdale* Harper 101.

But it is insisted that if the eighth section of the act of 1839, has not been otherwise abrogated, it was repealed by the constitution in 1847, which continued in force such territorial laws only, as were not repugnant to the constitution; that as our state judicial system is not as the territorial system was, and there having been a general change in the extent and number of the districts, and in the powers and number of the judges, the law in question is repugnant, and therefore inoperative. But we can see nothing in it repugnant to the constitution, or inconsistent

with our new form of government. We are unable to perceive how the change so often adverted to by counsel, can so seriously affect the law in question. Indeed, the same arguments would apply with equal force to vitiate all territorial laws at the adoption of the constitution.

Finally, it is objected, that the legislature of the territory had no right under the ninth section of the organic law, to pass an act authorizing the judges to hold such special terms of the district court, as they were by said section, to be held "at such times and places as might be prescribed by law." Strictly viewing this clause, it may very plausibly be assumed, that the courts could be held at such times only as the appropriate law might fix upon and designate. The application of this principle might safely be admitted so far as the regular terms of the courts are concerned; and this concession would not in the least, militate against the power of the legislature to authorize the judges to hold special or extra terms of their courts, whenever in their opinion occasion might require. This would be a rightful subject of legislation within the meaning of the organic law, and within the province of the legislative assembly. But had the legislature conferred upon the judges by statute, authority to prescribe the times, generally of holding their courts, would it not still be done by authority of law? It would still be a regulation emanating from the supreme legislative, and only authorized power within the general spirit and meaning of the organic law, if not within its strict letter. It is not, however, in this discussion necessary to inquire further into the power of the legislature, than that which has been exercised in authorizing the judges to hold special terms of courts. And upon this point, as already assumed, we can entertain no doubt. It is a power that never was judicially questioned, under the territorial organization, and has been too long acted upon to be now successfully controverted. The authority to hold special terms, should never be withheld from a court; it may be regarded as a right, which a court of general jurisdiction should exercise *ex*

*officio*; it frequently becomes indispensable in the administration of justice, and especially in extending to the accused in criminal prosecutions, his constitutional "right to a speedy and public trial."

Another objection was urged to this special term, to which we will merely advert. It is contended, that if the court was legally empowered to hold a special term, it was in this instance done without authority of law, because it does not appear by the record, that the judge notified the sheriff of the same, or that the sheriff put up at each of the precincts in the county, at least three weeks notice of the time when the special term was to commence. As decided by this court time and again, we must necessarily presume that the officers of the court performed their duty in such particular, unless the contrary appears. An averment of such facts in a record, is not necessary. The record being silent, the fact that legal notice was given, is established by intendment. There is another reason why this objection cannot now prevail, even if affirmatively before us. It does not appear to have been raised in the court below; but was silently acquiesced in, and waived. The proceedings of the court without such notice were not void. The statute providing for it, is merely directory, and such notice is not considered an essential prerequisite to confer jurisdiction. *Friar* v. *The State*, 3 How. Miss. 422. Such notice however, being particularly important as a safeguard to the public, and especially to those who may be affected by any special term; it should never be dispensed with by the courts; but the want of it should always be taken advantage of within a reasonable time, and at the proper place. On thus considering the objections raised to the special term, we must conclude that it was authorized by law.

2. It is assigned as error, and urged that the prosecution is not conducted in the name and by the authority of "the state of Iowa," as required by the sixth section in the sixth article of the constitution. It appears that in most of the proceedings, the article "the" is omitted, run-

ning in the name of "*state of Iowa,*" instead of "*the state of Iowa.*" These terms are essentially the same. The words used, designate the party and the state so clearly, that they cannot possibly be mistaken for any other party, state, or object. The short style, *State of Iowa* is recognized in the preamble and first article of the constitution. They appear to have been regarded by the framers of that instrument as synonymous terms, and to have been used indiscriminately as the same. Indeed the difference is so trifling, the defect in form so very minute and immaterial that we cannot regard it as worthy of serious consideration, especially at this late hour—the objection not having been raised, but silently acquiesced in, before the district court.

3. The objection is raised, that the record does not set forth that the indictment was found by a legal grand jury, nor does it contain their names. It appears by the record, that the indictment was exhibited in open court by the grand jury, and over the signature of their foreman indorsed a true bill. Upon that point, the record states all that is necessary, all that is required by the established practice and usage of our courts. The certificate of the foreman, affirming it to be a true bill, is evidence conclusive and proper, that it was duly found by a legal grand jury. *Spratt* v. *The State*, 8 Mis. 247. If the requisite number of lawful grand jurors had not participated in, and favored the finding, and presentment, it would not be "a true bill," as authenticated by the certificate of the foreman. *Rev. Stat.* 297, § 3; *Turns* v. *Commonwealth,* 6 Metcalf 225, 233.

It is we believe, in pursuance of the English practice, and a prevailing custom in all the states of this Union for the grand jurors to present the bills found by them, in open court, where they openly acquiesce in the finding; and this becomes another proper and strong item of evidence that the bill was found properly and by the required number of jurors. Hence in *The State* v. *Crighton*, 1 Nott & McCord S. C. 256, it was held that the finding of a grand jury, having been announced by the clerk in their presence, is good, although not signed by the foreman accord-

ing to the usual practice. A decision to the same effect has been made in our territorial supreme court. *Waukon-chaw-neck-kaw* v. *The United States*, Morris 332. The rules of practice recognized by this decision, we do not feel disposed to depart from. Their propriety and expediency not having been question, they have been generally concurred in by our courts. In that case, the court were very properly of the opinion, that the names of the grand jurors need not be inserted in the transcript of a record from the district court, and that other forms analagous to the English practice might be dispensed with. The cases cited by counsel from Howard's Miss. Reports, appear to have been predicated upon the old English authorities. But we have long since dispensed with many of the stringent rules, and nice technicalities which the courts of that country in mercy established, to shield and protect the prisoner against the harsh and sanguinary penalties of their criminal code for light and often trivial offences. Under the extreme severity of laws, which appear to have been enacted without the slightest regard to human life; and under regulations which did not secure counsel to the prisoner, and seldom a prompt, fair, impartial trial, no wonder that merciful judges under the promptings of humanity, and being regarded especially as protectors and counsel for the accused, should seize at trifling and unimportant objections to save the lives of those who may have been arrested for ordinary and often doubtful offences. But in this country, where life and liberty are so tenaciously guarded by our constitutions and laws, where a speedy, public and impartial trial is uniformly secured to the accused, where though destitute of friends or means, he is furnished with able counsel at public expense, and with compulsory process to secure the attendance of his witnesses, and at all times entitled to confront his accusers face to face; here where the accused is entitled to greater privileges than the prosecution in every stage of a criminal proceeding, the reason for such extreme technichality and unmeaning precision, ceases to exist. The

profound policy of the law, will not justify the continuance of a rule after all the reasons for it, have disappeared.

Recent decisions in England, show a commendable relaxation from those rigid technical rules which had been there adopted. These have resulted from the humane modification of their criminal code, which is becoming more characteristic of an enlightened christian government, and more conformable to the wise and just principles of the common law. In *The King* v. *Marsh*, Adolph & Ellis, 236, we have a decision in point showing that the English courts are ameliorating their old technical rules to a rational standard. It was in that case decided, that the number and names of the grand jurors need not be inserted in the caption of an indictment.

While upon this point, in order to settle the practice, and avoid controversy, it may be well for us to express our views as to the essential ingredients of a transcript from the record in criminal cases, when brought to this court for the correction of errors. *McKinney* v. *The People*, 2 Gil. 540, 551, in an excellent opinion, delivered by Judge Lockwood and which is, in many particulars appropriate to the case at bar, it is stated that, "in a criminal case after the caption stating the time and place of holding court, the record should consist of the indictment, properly indorsed, as found by the grand jury; the arraignment of the accused, his plea, the impanneling of the traverse jury, their verdict, and the judgment of the court. This is all, in general, that the record need state." This we consider a safe rule, comprehending all that is necessary to be enrolled as constituting the record proper in a case. It may be remarked that any decision or judgment of the court in the case made preliminary to the final judgment, becomes *per se* a part of the record, but all other matters and proceedings, such as motions, exceptions, testimony and the like, do not form any part of the record unless made so by order of court, by agreement of parties, by demurrer to evidence, by special verdict, or by bill of exceptions. In one of these methods, every thing mate-

Harriman *v*. The State.

rial or in any way affecting the rights of parties in the proceeding below, may be preserved and brought to the notice and review of this court. And unless so brought before us, or if the transcript of the record does not advert to the fact complained of, we must take it for granted, that the proceeding was according to law.

Finally, upon this point, even if the objection under consideration, amounted to the irregularity complained of, it was waived by the prisoner's pleading and submitting to a verdict without objection.

4. It is assigned as error, that the court appointed an elisor to impannel the jury; and it is insisted, that under the statute, the coroner should perform that duty in all cases where the sheriff becomes incompetent, under the influence of "partiality, prejudice, consanguinity, or interest." *Rev. Stat.* 195, § § 2, 3, 4.

5. It is also insisted, that the court erred in permitting the sheriff to act after the prisoner filed his affidavit objecting to him.

6. That the court erred in impanneling the second jury.

It appears by the bill of exceptions, and by the affidavit therein copied, that the proceedings referred to in the last three objections, were had chiefly at the especial request of the prisoner. In his affidavit stating the sheriff to be prejudiced against him, he expressly prays the court to appoint an elisor to act in his place. Had the affidavit objected to the sheriff alone, without desiring the appointment of an elisor, the coroner, had there been one, should no doubt have performed the duties; but by desiring an elisor, the prisoner by strong implication at least manifested an objection to the coroner, and therefore for his benefit, the court very properly appointed an elisor. But it appears, that the sheriff acted after the affidavit was filed, in summoning the panel of jurors for the special term, at which the prisoner was tried, and also in selecting talesmen after the regular panel was exhausted. Had the prisoner or his counsel objected, this would have been palpably irregular; but we are advised by the bill

35

of exceptions, that it was done "in the presence and hearing of the prisoner without objection on his part; that after the sheriff had summoned several talesmen, the counsel of the prisoner stated, that they were unwilling to have the sheriff proceed any further and requested the court to appoint some other person, and the court with the consent of the prisoner, directed Robert Rinkade to act as an elisor, during the trial. The jury of twelve men who tried the cause were not objected to by either party before they were sworn, for any irregularity or informality in summoning any of the jurors."

The objection does not appear to have been raised till after the verdict, when it was urged in support of the motion to arrest the judgment. This we regard as a sufficient answer to these objections. The proceedings were either at the request, or met with the acquiescence of the accused, and he should not now be permitted, to come in and take advantage of slight and unimportant irregularities, which took place mostly for his benefit, and at his request. We freely concede the correctness of the principle in criminal cases, and especially when human life is at stake, that the prisoner is to be considered as standing on all his essential rights, and as waiving nothing as to material irregularity which may detract from a fair and impartial trial; but we can see nothing in those before us, which could injuriously affect the rights of the accused, or in any way work injustice or hardship upon him; nothing of which he now has a right to complain. The authorities cited by counsel for the state, sufficiently confirm the correctness of the principle we have hitherto followed, that it is too late after verdict, to object to irregularity in the manner of impanneling the jury, when no objection was raised on the trial.

But independent of this rule which disposes of the question, the objection raised to the second jury could not be sustained. The jury impanneled at the regular term of the court, were necessarily discharged after the prisoner's application for a continuance was granted; and the ad-

journment of that term of the court, which, it appears immediately followed the continuance of this cause, necessarily dissolved the regular panel of jurors, which was only summoned for that term. A new *venire,* another jury became indispensable for the special term, and for the trial of the prisoner. Clearly there was no other course for the court to adopt, and we think it would puzzle even the ingenious counsel in this case, to point out any plausible alternative.

7. It is assumed that the prisoner was not present at the trial, and when the jury rendered their verdict, and that the fact of his presence must appear affirmatively of record.

The right of a prisoner to be present during the progress of the trial, and when the verdict is rendered, cannot be questioned. The right "to be confronted with the witnesses against him," is guaranteed by the constitution; and it is essential that he should be present when the verdict is rendered, in order to exercise the right of polling the jury. This is generally regarded by courts, as an important incident to a jury trial. In New York, the practice is to give either party the privilege of having the jury polled at any time before the verdict is recorded. *Fox* v. *Smith,* 3 Cow. 23; *The People* v. *Perkins,* 1 Wend. 91. The courts of Massachusetts and South Carolina deny this right. *Commonwealth* v. *Roby,* 12 Pick. 496, 512; *State* v. *Allen,* 1 M'Cord 525. But the practice of the New York courts in that particular and which also prevails in England has been adopted by most of the state courts in this country, and being more conformable to the rights of parties, we are of the opinion that the rule should continue to obtain in Iowa. In order to secure this important right to prisoners, then it is necessary that they should be present at the time the verdict is pronounced. But does it appear by the record in the present case, that the accused was not in court during the trial, or when the verdict was returned? We think not. He appears to have been regularly arraigned, and the record entry of the day on which his trial commenced, declares that the prisoner was brought

into court; and the entry of the day on which the verdict was rendered refers to the prisoner at the bar; and again his presence is sufficiently shown by the bill of exceptions. And even if the record after the arraignment remained perfectly silent upon this point, we could not by implication conclude that the judge neglected his duty in this particular; but we should rather suppose, by legal intendment till the contrary appears, that the court had performed its duty in all those particulars, and had extended to the accused his constitutional and legal rights.

8. There are three errors assigned, which may be considered under one question. Is it necessary, that the transcript of the record should set forth the names of the witnesses upon whose evidence the indictment was found? They unquestionably should be indorsed upon every true bill returned by the grand jury to the district court; *Rev. Stat.* 297, § 3; but it by no means follows that they should necessarily become a part of the record in a case; it is not usual to have them so incorporated, nor does it come within the rule we have given in this opinion. It is one of those facts which a court will always presume favorable to the correctness of the proceeding. Again, if the names of the witnesses were not indorsed upon the indictment the objection should have been raised before the district court, otherwise it will be considered as waived. In effect at least, this question was so decided by this court at Burlington in *Ray* v. *The State*, 1 G. Greene 316.

In thus confirming the action of the court below upon these various points, it may be well to observe, that we have been in no small degree influenced by the liberal policy of our criminal code, in dispensing with many of the forms and technicalities, which have prevailed to an alarming extent in the administration of criminal jurisprudence. We are admonished by the many failures in prosecutions for heinous offences, that the imperative duty devolves upon courts to disregard unsubstantial forms, and unmeaning technicalities, and to look more to the substance and merits of each case. This is necessary to preserve

the majesty of law, and to promote principles of peace, equality and justice.

But we do not wish to be understood as entirely disregarding legal forms and technicalities. There are many, very many, which possess marked utility and which exercise a wholesome restraint and salutary influence in practice. These become matter of substance and should therefore be adhered to, especially those of an established character, which impart uniformity, stability, certainty, and solemnity to judicial proceedings. Among the most important of these, we class the form of an oath, required by law to be administered to the jury in the trial of a criminal cause; which leads us to the only remaining question worthy of consideration in this case.

9. It is alleged, that the oath of the jury as shown by the record was illegal. The record sets forth, that the jury were " sworn the truth to speak upon the issue joined between the parties." This appears to have been the form of the oath administered to the jury, as a qualification to try a prisoner, upon an issue involving life or death. It is so deficient in substance, so barren of solemnity, of essential declarations and restrictions, which should be required as the most imposing moral and legal restraint, from those who are intrusted with the life and destiny of a fellow being, that we can under no rule of practice affirm the judgment which resulted from their verdict. *Rev. Stat.* p. 298, § 5, requires " that the oath or affirmation of petit jurors in criminal cases, shall be as follows, to wit: "You solemnly swear (or affirm,) that without respect to person or favor, or fear, you will well and truly try, and true deliverance make between the "*State of Iowa,*" and the prisoner at the bar, whom you shall have in charge, according to the evidence given you in court, and the laws of this "*state*," so help you God." This is the oath, which under the requirements of our statute, should have been administered to the jury. Had their oath contained the substance of this in any other form, we should after verdict, have regarded it as sufficient. Or had the record re-

mained silent upon this point, we should have presumed that they had taken the legal oath. But as it is, as the record discloses so obvious an error, the judgment must be reversed, and a trial *de novo* awarded.

Judgment reversed.

*Dissenting opinion by* KINNEY, J. I most respectfully dissent from so much of this opinion as authorizes the word " *The*" to be left out in the style of the process in criminal prosecutions. The constitution provides that the style of the process shall be " *The State of Iowa*" and all prosecutions shall be conducted in the name and by the authority of the same. Art. 5, § 6, Con.

The word " The" is as much a part of the style of the process as either of the other words designated. It takes all the words to constitute the style; one can be left out with as much propriety as the other. I cannot for a moment sanction a departure from what appears to my mind so plain a constitutional requirement. A strict adherence to constitutional provisions is the only safety for courts of justice.

*D. Rorer* and *J. C. Hall*, for the prisoner.

*A. H. Patterson* and *E. H. Thomas*, for the state.